<u>VIRGINIA</u>:

BEFORE THE VIRGINIA STATE BAR DISCIPLINARY BOARD

IN THE MATTER OF
TIMOTHY ANDREW LITZENBURG                VSB DOCKET NO. 20-070-117650

## CONSENT TO REVOCATION ORDER

On August 10, 2020, came Respondent TIMOTHY ANDREW LITZENBURG and

presented to the Board an Affidavit Declaring Consent to Revocation (hereinafter "Affidavit") of

his license to practice law in the courts of this Commonwealth.  By tendering his Consent to

Revocation at a time when allegations of Misconduct are pending, the nature of which are

specifically set forth in the attached Affidavit, Respondent acknowledges that that the material

facts upon which the allegations of Misconduct are pending are true.

The Board, having considered the Affidavit, and Bar Counsel having no objection,

accepts Respondent's Consent to Revocation.

Upon consideration whereof, it is therefore ordered that Timothy Andrew Litzenburg's

license to practice law in the courts of this Commonwealth be and the same hereby is revoked,

and that the name of TIMOTHY ANDREW LITZENBURG be stricken from the Roll of

Attorneys of this Commonwealth.

ENTERED THIS 11TH DAY OF AUGUST 2020

VIRGINIA STATE BAR DISCIPLINARY BOARD

By **Yvonne S. Gibney**
Digitally signed by Yvonne S. Gibney
Date: 2020.08.11 11:11:21 -04'00'
Yvonne S. Gibney
Chair



A COPY TESTE
DaVida M. Davis
DaVida M. Davis
Clerk of the Disciplinary System
Virginia State Bar

**RECEIVED**

**Aug 10, 2020**

VIRGINIA STATE BAR
CLERK'S OFFICE

**V I R G I N I A:**

## BEFORE THE VIRGINIA STATE BAR DISCIPLINARY BOARD

IN THE MATTER OF                          **VSB Docket No. 20-070-117650**
TIMOTHY ANDREW LITZENBURG

## AFFIDAVIT DECLARING CONSENT TO REVOCATION

Timothy Andrew Litzenburg, (Respondent) after being duly sworn, states as follows:

1.     That Respondent was licensed to practice law in the Commonwealth of Virginia on 16 December 2008;

2.     That Respondent submits this Affidavit Declaring Consent to Revocation pursuant to Rule of Court, Part 6, Section IV, Paragraph 13-28;

3.     That Respondent's consent to revocation is freely and voluntarily rendered, that Respondent is not being subjected to coercion or duress, and that Respondent is fully aware of the implications of consenting to the revocation of his license to practice law in the Commonwealth of Virginia;

4.     That on 16 December 2019, a Criminal Complaint was filed, charging Respondent with multiple felony counts, including violations of Title 18 U.S.C., Section 875 (d) (Transmission of Interstate Communications With Intent to Extort), Title 18 U.S.C., Section 371 (Conspiracy), and Title 18 U.S.C., Section 1951 (Attempted Extortion);

5.     That on 19 June 2020, Respondent pled guilty in the United States District Court for the Western District of Virginia, Charlottesville Division, to one count of Transmission of Interstate Communications With Intent to Extort in violation of Title 18 U.S.C., Section 875 (d). A copy of the Criminal Complaint, the Affidavit Supporting the Complaint, Criminal Information, Plea Agreement, Statement of Facts and Guilty Plea are attached as Exhibits "A,"

"B," "C," "D," "E," and "F," respectively,

6.    That Respondent hereby acknowledges and adopts the facts as stated in the Plea Agreement and Statement of Facts attached hereto as Exhibits "C" and "D" respectively;

7.    That the maximum sentence provided by statute for the offense to which the Respondent pled guilty is two (2) years imprisonment, a fine of not more than $250,000, and a term of supervised release of up to one (1) year;

8.    That pursuant to Part Six, § IV, Paragraph 13-22 of the Rules of the Supreme Court of Virginia, Respondent's plea and the finding of guilt by the United State District Court for the Western District of Virginia, Charlottesville Division, requires that Respondent's license to practice law in the Commonwealth of Virginia be suspended pending a hearing before the Disciplinary Board of the Virginia State Bar.

9.    That as the result of his plea of guilty to one count of Transmission of Interstate Communications With Intent to Extort in violation of Title 18 U.S.C., Section 875 (d), Respondent consents to the revocation by the Virginia State Bar of his license to practice law in the Commonwealth of Virginia;

10.    That Respondent submits that if a hearing were held pursuant to a Rule to Show Cause, he would have testified to suffering from a long-time substance use disorder which had affected his judgment. He further would have testified as to his efforts at seeking and participating in treatment and recover, including the Virginia Judges and Lawyers Assistance Program.

11.    That, notwithstanding the above proffered testimony, Respondent takes full responsibility for his action and submits that Affidavit and consents to the revocation of his

2

license to practice law in the Commonwealth of Virginia because he knows that if a hearing were held pursuant to a Rule to Show Cause and if the matter were brought to a conclusion, he could not successfully defend the matter.

12.    Pursuant to Part Six, § IV, Paragraph 13-28.B., I understand this affidavit and the admissions contained herein may not be deemed an admission in any proceeding except one relating to my status as a member of the Virginia State Bar.

Executed and dated on ___31 July 2020___

_____
Timothy Andrew Litzenberg
Respondent


COMMONWEALTH OF VIRGINIA
CITY/COUNTY OF _Charlottesville_, to wit:

The foregoing Affidavit Declaring Consent to Revocation was subscribed and sworn to before me by Timothy Andrew Litzenberg on _July 31st, 2020_.

_____
Notary Public

My Commission expires: _July 31st 2023_

BERNADETTE SIMONE MADA TINE
NOTARY PUBLIC
REG. #7854459
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES JULY 31, 2023

3



307 Westminster Rd
Charlottesville VA
22901

RICHMOND VA 230

05 AUG 2020 PM 2 L

Scott Price
VSB
1111 E Main St
Suite 700
Richmond    VA    23219

RECEIVED
AUG 1 0 2020
VIRGINIA STATE BAR

23219-002675

AO 91 (Rev. 11/11) Criminal Complaint

CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILE, VA
FILED

# UNITED STATES DISTRICT COURT

for the

Western District of Virginia

DEC 1 6 2019

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. 3:19-mj-00069 |
| | ) | |
| Timothy Litzenburg | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| Defendant(s) | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __October 2019 - November 2019__ in the county of __Albemarle__ in the __Western District__ District of __Virginia__ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 875(d) | Transmission of interstate communications with intent to extort |
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. § 1951 | Attempted Extortion |

This criminal complaint is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

_____
Complainant's signature

Kevin Towers, Postal Inspector (USPIS)
Printed name and title

Sworn to before me and signed in my presence.

Date: __12/16/19__

_____
Judge's signature

City and state: __Charlottesville, VA__

Honorable Joel C. Hoppe, U.S. Magistrate Judge
Printed name and title

Exhibit "A"

CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILE, VA
FILED

DEC 16 2019

JULIA G. DUBLEY, CLERK
BY:
DEPUTY CLERK

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**CHARLOTTESVILLE DIVISION**

UNITED STATES OF AMERICA          )
                                  )    **UNDER SEAL**
            v.                    )
                                  )    Criminal No. 3:19-mj-00069
TIMOTHY LITZENBURG,               )
                                  )
            Defendant.            )

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Kevin Towers, being duly sworn, hereby depose and state as follows:

### Introduction

1.      I am a Postal Inspector employed by the United States Postal Inspection Service ("USPIS") and have been so employed for over fourteen years. As a Postal Inspector, I received training in investigating violations of federal statutes, including those regarding conspiracy, wire fraud, money laundering, and other financial crimes. More specifically, I have conducted physical surveillance, electronic surveillance, executed search warrants, analyzed phone and text records, and obtained and reviewed financial documents and records of fraudulent activity. I have also spoken to suspects, defendants, witnesses, and other experienced investigators concerning the methods and practices of criminal enterprise groups, especially those involved in financial crimes.

2.      This affidavit is made in support of a criminal complaint charging Timothy Litzenburg with transmission of interstate communications with intent to extort (in violation of 18 U.S.C. § 875(d)), conspiracy to commit transmission of interstate communications with intent to extort (in violation of 18 U.S.C. § 371), and attempted extortion, as well as conspiracy to commit extortion (in violation of 18 U.S.C. § 1951).

1

3.      This affidavit is based on my personal investigation and the investigation of others, including federal law enforcement officials whom I know to be reliable.  The facts and information contained in this affidavit are based upon information provided by witnesses and my review of records, documents, and other physical evidence obtained during this investigation.

4.      This affidavit does not include each and every fact known to the government, but only those facts necessary to support a finding of probable cause to support the requested arrest warrant.

<u>**Probable Cause**</u>

**I.      Litzenburg's Initial Contact with Company 1**

5.      According to public records from the Virginia State Bar, Timothy Litzenburg is an active member of the bar whose office is located on Westminster Road in Charlottesville, Virginia. Litzenburg lists his employer as "Roundup Cancer Firm plc."   According to public records from the Commonwealth of Virginia State Corporation Commission, Roundup Cancer Firm, LLC was formally registered as a Virginia corporation on or about September 24, 2018.  Litzenburg is listed as the registered agent for the Roundup Cancer Firm.

6.      According to public sources, Litzenburg has been involved in litigation against Monsanto, a chemical company that manufactured, among other things, a weed-killer sold under the brand name Roundup.  Roundup's active ingredients include glyphosate, a chemical allegedly linked to non-Hodgkin's lymphoma.[1]

---

[1] According to a 2018 civil complaint, Litzenburg was previously employed at a Virginia law firm that focuses on representing plaintiffs in personal injury matters.  *Miller Law Firm v. Litzenburg*, No. CL 18001118 (Orange Cty. Cir. Ct.).  The civil complaint alleges, in or around June 2018, Litzenburg "actively began to surreptitiously steal The Miller's Law Firm's confidential information and trade secrets."   The civil complaint sues Litzenburg for breach of fiduciary duty; tortious interference, statutory business conspiracy; common law civil conspiracy; misappropriation of trade secrets; and violation of the Virginia Computer Crimes Act.

2

7.      Company 1 is a privately owned chemical manufacturer, with facilities located all over the world.  In or around 2018, Company 1 was acquired by Company 2, a publicly traded U.S. corporation listed on the NASDAQ exchange.

8.      In or around early September 2019, Litzenburg transmitted to Company 1 a draft complaint ("Draft Complaint") on behalf of Person 1, whom Litzenburg claimed to represent.  The Draft Complaint alleged that Company 1 and other related companies created several chemical compounds used by Monsanto to create Roundup, some of which the Draft Complaint alleged to be carcinogenic.  Among other things, the Draft Complaint alleged that Company 1 knew of the carcinogenic properties of these chemicals but failed to warn Roundup users and others exposed to Roundup about those risks.

9.      After receiving the Draft Complaint, Company 1 retained outside counsel to communicate with Litzenburg.  On or about September 11, 2019, an attorney representing Company 1 ("Attorney 1") spoke with Litzenburg by telephone.[2]

    a.  According to Attorney 1, on the September 11, 2019 call, Litzenburg described himself as being involved in mass torts litigation since approximately 2012.  Litzenburg also stated that he was working with a Chicago-based attorney ("Associate 1") and another Virginia-based attorney ("Associate 2") on potential other Roundup-related litigation.[3]

---

[2] During telephone calls involving Litzenburg and Attorney 1, one or more other members of Attorney 1's law firm listened to the conversations but did not participate.  These associates were generally not introduced on the telephone line, such that Litzenburg may not have been aware they were on the line.

[3] During communications with Company 1 and their outside counsel, Litzenburg repeatedly has claimed to be working with Associate 1.  Neither Company 1 nor Law Firm 2 (the law firm retained by Company 1) has ever been contacted by or had communications with Associate 1 or associates from his Chicago-based law firm.

      b.  According to Attorney 1, Litzenburg said that he was considering filing the Draft Complaint involving Person 1 unless he was granted an in-person meeting with representatives of Company 1. Litzenburg said he would postpone filing the Draft Complaint for two weeks in order to accommodate an in-person meeting.

10.   Following the September 11, 2019 telephone call, Litzenburg and Attorney 1 continued to exchange emails and telephone calls about possible further meetings. During the course of communications, Litzenburg pressed for an in-person meeting in Charlottesville, Virginia. In an email to Attorney 1 on October 15, 2019, Litzenburg wrote that he "had no intention of holding [the Draft Complaint] until November . . . . However, as one more gesture of good faith . . . I would be willing to hold off a couple of weeks under the following terms," which included scheduling a meeting on "Halloween" in "Charlottesville, where I generally conduct most significant and discreet business."

## II.   Litzenburg's First Demand for a $200 Million "Consulting Agreement" from Company 1 or Company 2, in Exchange for Not Advising Clients to Sue Company 1

11.   On or about October 16, 2019, Litzenburg and Attorney 1 had another telephone call. Associate 2 also participated on the telephone call. During the telephone call, Attorney 1 was outside the Commonwealth of Virginia at the time the communication occurred.

      a.  According to Attorney 1, Litzenburg stated during the call that he still intended to file the Draft Complaint, unless a resolution could be found. Litzenburg indicated that if he did file a public lawsuit, other lawsuits would likely follow as the public became aware of Company 1's role.

      b.  According to Attorney 1, Litzenburg and Associate 2 indicated that they represented 800 clients in Roundup-related litigation against Monsanto. Litzenburg indicated that, to date, he had not informed any Monsanto client about Company 1

4

or the possibility of bringing a Roundup-related lawsuit against Company 1.

    c.   According to Attorney 1, after describing the possibility of the lawsuits against Company 1, Litzenburg proposed that he and Associate 2 could enter into a "consulting arrangement" with Company 1. Doing so, Litzenburg stated, would create a purported conflict-of-interest that would effectively stop him from representing plaintiffs in litigation against Company 1.

12.    On or about October 18, 2019, Litzenburg and Attorney 1 had another telephone call in which Litzenburg again raised the issue of entering a "consulting agreement" with Company 1. During the telephone call, Attorney 1 was outside the Commonwealth of Virginia.

    a.   According to Attorney 1, Litzenburg stated that as a first step, he wished to settle the case between Person 1 and Company 1 for $5 million.

    b.   According to Attorney 1, separate from the $5 million settlement for Person 1, Litzenburg indicated that he separately wanted "consulting arrangements" for himself and Associate 1 worth a total of $200 million. Litzenburg described the $200 million as the "bottom line." According to Attorney 1, Litzenburg also indicated that, instead of the "consulting agreement" being with Company 1, he would also accept a "consulting agreement" with Company 2 (of which Company 1 was a subsidiary).

    c.   According to Attorney 1, Litzenburg also clarified that the $200 million would not be used to resolve any of the potential lawsuits that could be brought by Litzenburg's other clients. Litzenburg stated that the $200 million in "consulting" fees would not result in additional releases from litigation by those plaintiffs.

5

### III.    Litzenburg's Written "Demand" for a $200 Million "Consulting Agreement" from Either Company 1 or Company 2

13.    On or about October 24, 2019, Litzenburg emailed Attorney 1 (who was outside the Commonwealth of Virginia at the time): "Please accept this email as a written demand in follow up to our discussion about the same." In the email, Litzenburg reiterated his demand for a $5 million settlement for Person 1 and a separate $200 million "consulting agreement" for himself and his associates.

14.    Litzenburg described resolving Person 1's case as "only a first step." Litzenburg then said if Person 1's case is resolved, "We would simply advertise and sign up more users of Roundup home products that contain [Company 1 chemicals]. In fact, that is precisely our plan, absent some agreement to the contrary."

15.    Litzenburg continued, "The [Company 1] non-Hodgkin lymphoma litigation that we are planning will be 'Roundup Two,' and I'm excited to lead the charge again. This time, to my great financial benefit."[4] Litzenburg stated that if he filed suit against Company 1, "[t]here would quickly be a docket of thousands of cases against [Company 1]."

16.    If litigation commenced, Litzenburg warned, "[t]his become [*sic*] an ongoing and exponentially growing problem for [Company 1], particularly when the media inevitably takes notice. The defense costs and cost to ultimately resolve the thousands or tens of thousands of cases would be well into the billions, setting aside the associated drop in stock price and reputation damage."

17.    Instead of the supposed consequences of litigation, Litzenburg suggested "a potential

---

[4] Litzenburg claimed in his email to have been instrumental in prior Roundup litigation, stating in part, "I filed the first Roundup case against Monsanto, retained the first experts, took the first depositions, and likewise maneuvered the first case to trial and a $289.2 million verdict for my client . . . ."

6

solution" that would avoid the costs associated with litigation, reputational damage, and a drop in stock price. Specifically, Litzenburg proposed that Company 1 and Litzenburg "enter into a consulting arrangement with [Company 1] or a related entity, or somw otjer wuch relationship [*sic*]," that would "prevent my firm . . . from suing [Company 1]." Litzenburg claimed that with such a "consulting arrangement," "[Company 1] would weather the storm and avoid the parade of horribles I outlined in short form above."

18. Litzenburg continued, "Our demand/proposal related to a consulting agreement with my firm and [Associate 1] is two hundred million ($200,000,000) to be shared by our firms. As I previously mentioned, please do not misconstrue this demand as indication that we would accept half that or less." Litzenburg later described the $200 million "demand" as "a very reasonable price" compared to the "significant financial consequences to [Company 1] of a protracted and public 'Roundup Two.'"

19. Litzenburg concluded by reiterating his request for an in-person meeting on "Halloween" (October 31, 2019) in Charlottesville, Virginia and stating, "I hope the [Company 1] Board and any other decisionmakers have a chance to consider these demands/proposals...Just to set expectations, this is something we would like to resolve in 2019 or have litigation well underway by January 1, 2020."

## IV. Litzenburg Discusses His Demand for $200 Million "Consulting Agreement" During a Consensually Recorded Call and Offers to "Take a Dive" During a Deposition

20. On or about October 29, 2019, Company 1's outside counsel contacted prosecutors from the U.S. Department of Justice ("DOJ") regarding Litzenburg's actions. On or about October 30, 2019, DOJ prosecutors and I spoke telephonically with Company's 1 outside counsel. During that call, Attorney 1 summarized her prior contacts with Litzenburg. Attorney 1 also reported that she and another attorney, Attorney 2, expected to speak telephonically with Litzenburg on or about

October 30, 2019. Attorney 1 and Attorney 2 agreed to allow USPIS to record this telephone call.

21.    On or about October 30, 2019, Attorney 1 and Attorney 2 spoke telephonically with Litzenburg, who they understood was in Charlottesville at the time. During the call, Attorney 2 asked how Litzenburg came arrived at the $200 million figure he had asked for in "consulting" fees. Litzenburg responded, "It's opportunity loss," later adding, "I think it's lower than the extraordinarily low end estimate of what [Associate 1] and I would make off this litigation."[5] Litzenburg also added,

> [T]he way that I guess you guys will think about it and we've thought about it too is savings for your side. I don't think if this gets filed and turns into mass tort, even if you guys win cases and drive value down . . . I don't think there's any way you get out of it for less than a billion dollars. And so, you know, to me, uh, this is a fire sale price that you guys should consider, uh, you know, for a limited time.

22.    Attorney 2 then asked about where the $200 million from Company 1 would be sent, asking "the money is not going into a[n] . . . individual plaintiff's compensation fund or anything like that. This is money that's going straight to you and your partners, correct?" Litzenburg responded,

> [I]t is our analysis [*inaudible*] retainer Virginia Law and actually American Bar sort of standard law that we have no obligation at this time to, um, recommend to our clients to, uh, add [Company 1] into a suit, uh, because of manufacturers I've laid out for you before. That doesn't mean we're prohibited from doing it, but we think very strongly that we have no obligation to do so whatsoever.[6]

---

[5] The language quoted from consensually recorded calls and meetings in this affidavit are draft transcripts. The government continues to review the transcripts for accuracy. Certain verbal tics and non-substantive sounds have been omitted for ease of reading.

[6] Litzenburg also said, "We have to carefully research everything. But we have already been doing so with some of the top ethics lawyers and big firms already, asking some general questions about this." Litzenburg never identified those purported "ethics lawyers" or their analysis to Company 1 or the lawyers representing them.

23.    Attorney 1 asked how the "consulting arrangement" with Company 1 would prevent lawsuits from getting filed. Litzenburg responded in part, "I think we can talk to people we knew, if they were thinking of going that route [i.e., thinking about suing Company 1]. I think [Associate 1] is gonna be a real asset there. Anybody thinking of filing a mass tort [lawsuit] in Chicago is gonna come to [Associate 1]. And if he says, "We thought about that. We thought it was a terrible idea. Move on." Litzenburg clarified, "Of course I've explained to you guys what I think I win with juries is on causation, but nobody else is going to figure that stuff out. Um, and I think the likelihood people come to me or [Associate 1] first, uh, before even going down that road is pretty . . . is pretty high."

24.    Later in the telephone call, Litzenburg told Attorney 2: ."You could forward your own toxicology experts or something at a pre, uh, trial, um, deposition. I mean, a pre-suit deposition as part of some sort of, you know, negotiation with a pre-suit. And we ask the wrong questions." Litzenburg explained that, as a result, "you would have a deposition transcript where I basically got whacked, um, but did nothing. . . . And that could sort of be something that you kept in a vault somewhere to pull out if you ever got bothered by someone that didn't know me or whatever." Litzenburg later described this tactic as one where he would "almost sort of take a dive as long as it's legal, and ethical, and best for our one client."[7]

25.    At another point of the conversation, Litzenburg suggested that, as part of the deposition exercise in which he would "take a dive," Company 1 and Person 1 could purport to

---

[7] During his communications with Company 1, Litzenburg has repeated variations of the phrase "legal and ethical" dozens of times. Litzenburg never elaborated on that statement beyond repeating it frequently, nor has ever identified an action he would *not* take due to ethical or legal considerations.

9

execute a "high-low agreement,"[8] with the minimum amount set at the actual amount demanded by Litzenburg. Litzenburg explained that they would settle for the "minimum" in the purported high-low agreement after the deposition, making it appear that Person 1's lawsuit had not been successful in the deposition stage of the proceeding.

26.   During the recorded telephone call, Litzenburg repeatedly said that he represented hundreds of clients in pending Roundup-related litigation against Monsanto; Litzenburg also stated that he would continue representing them in the Monsanto litigation. At one point, Attorney 1 asked what would prevent the clients from "switch[ing] law firms and then up bringing another claim against [Company 1]." Litzenburg responded:

> Well, I have no idea what would prompt that, I guess, *is my first question*. Um, I have no idea what would cause that. None of them have ever heard of [Company 1]. Uh, none of them have ever heard of [name of company affiliated with Company 1]. Um, and, uh, again, our analysis is with a settlement right around the corner, some of them waiting some years, um, we're not going to suggest that they wait another five years to get a Chicago trial date when they have probably a…a bird in the hand right around the corner.

27.   Talking about other clients he purported to represent in the Roundup litigation against Monsanto, Litzenburg stated that he was "[a]bsolutely not" obligated to recommend to clients the possible litigation against Company 1. Litzenburg claimed that "our retainer gives us, uh, the…the full discretion to decide what entities are…are most worth going after for you to get the most in the…least amount of time essentially." Litzenburg implied that he could therefore steer away those existing clients away from Company 1 if the parties reached a "consulting agreement."

---

[8] In mass torts, a "high-low agreement" is an agreement between the parties that caps the minimum and maximum amounts of recovery, thereby giving the parties some assured level of recovery while limiting the highest possible recovery.

**V.    Litzenburg Demands a Consulting Agreement to "Avoid the Parade of Horribles" of Having Him Sign Up "Thousands of Future Plaintiffs" Against Company 1**

28.    On or about November 6, 2019, Litzenburg continued to seek a consulting agreement in an email to Attorney 1 and Attorney 2.

    a.    Litzenburg began by claiming to have "a simply list of 1000ish Roundup clients who hired me to sue Monsanto and that number is growing every day." However, Litzenburg said that Person 1 "is the only client with whom we have had discussions about a claim against [Company 1]." However, Litzenburg said that without a consulting agreement, he predicted he would have "thousands of future plaintiffs against [Company 1]," which he could find through "our extensive network of referral lawyers, lead generators, and advertising machinery that you know well could produce . . . thousands of new claimants/clients for me and [Associate 1] by the new year."

    b.    Litzenburg continued, "While I cannot guarantee and warrant complete finality . . . [Company 1] will be exceedingly well-positioned to weather this storm if it settles my single case . . . and if we subsequently agree to offer consulting . . . ." Entering a "consulting agreement," Litzenburg claimed, "will mean that [Company 1] avoids the parade of horribles that has been the Roundup litigation for Bayer/Monsanto."

    c.    Litzenburg concluded, "That is another thing I can guarantee and warrant: in the absence of a so-called 'global' or final deal with me, this will certainly balloon into an existential threat to [Company 1]."

**VI.    Litzenburg Says He Is Company 1's "Biggest Problem" and Warns of a "40% Stock Loss" Unless They Enter a $200 Million "Consulting Agreement"**

29.    Litzenburg had repeatedly requested an in-person meeting with the attorneys

11

representing Company 1.  On or about November 12, 2019, attorneys representing Company 1 met

Litzenburg at a conference center in Charlottesville, Virginia.  Associate 2 was also in attendance.

Attorneys representing Company 1 consented to the USPIS recording the interview, and the

meeting was held in a room USPIS personnel had wired for audio and visual recordings.

30.    At the beginning of the meeting, Litzenburg made the following introductory

comments:

> I assume that a company as smart as [Company 1] and [Company 2]
> has had reserves in this, whether you guys were involved or
> something from the . . . it's been a concern I am sure. You don't
> have to try to convince me otherwise.
>
> Um, and I'm sure if they've been watching the litigation, those
> reserves are multiples of what we're talking about here. Um, and
> they've been biting their nails for years over this, um, waiting to see,
> you know, if this problem is gonna come to a head. And we have
> brought the problem to a head, but only among the people in this
> room.
>
> And so there is now a problem to solve that I think brings certainty.
> Um, you know, all I'm certain of is, um, we're gonna be the leading
> edge of the next mass torts. . . .  You know, I took a hard left at
> pharmaceuticals. I may take a hard left at chemicals and
> pesticides. We'll see. I mean, that...that remains to be seen
> and...and decided largely by, you know, your client.
>
> Um, but I'm sure that we'll be, um, leading that
> and...and...and...both   formally   and   informally.   Um,
> what's...what's certain, uh, is that if we walk out of here today
> without a deal, and we, uh, you know, the [Person 1] case gets filed
> and gets served. And we've talked about the consequences.

31.    Early on in the meeting, Litzenburg stated that if litigation commenced, there was no

way Company 1 "gets out of it for less" than "[a] billion. Yeah. No, I mean, nuisance value, uh,

defense lawyer fees, a hit in the stock when this gets filed and served, maybe the press conference,

whatever." Litzenburg then continued,

12

> [W]e can be, um, your biggest problem. Right now we're your only
> problem or potential problem. Uh, we have one identified certain
> conflict that...that we can discuss, and we can discuss
> other...discuss some other creative ideas. Uh, or we can be an asset.
> You know? And I've...I've talked about creative ways to not only
> make the problem go away but, um, try to help [Company 1] and
> perhaps its sister companies avoid this problem and other problems
> in the future.

32.    Later on, Litzenburg again stated the litigation he contemplated would have adverse

effects on stock price.[9]

> We walk out of here today, and you're telling them, you know, "You
> are absolutely, absolutely making a quarter of a million, 500 million,
> billion plus dollar investment in a public relations nightmare." You
> know, [*inaudible*] in a 40% stock loss coming off the top. And
> that...that's what they're deciding between is whether to avoid that, '
> uh, or to buckle down for that. Uh, you know, there is no... I mean,
> I know you're gonna have to call and tell your client. The client is
> gonna be understanding probably 'cause they're gonna be saying,
> "We don't have to deal with this." They've got a way bigger than a
> quarter million dollar investment in a...in a nightmare.

33.    During the meeting, attorneys representing Company 1 inquired about the

"deposition" that Litzenburg proposed doing before. Litzenburg responded:

> Um, I mean, it depends on what we're asking for. But yeah,
> [*inaudible*] prevents exposure for y'all and erase the trail, like we've
> talked about. . . . [I]t borders into misrepresentation and taking a ·
> dive sort of thing. I think it's okay as far as we've looked at. But·
> for . . . for reasons that . . . It would [*inaudible*] for us in reasons I'm
> sure you can figure out, um, to do on a first case before we have . . .
> We can't do it under a consultancy with you before we, um, settle .
> this case. I don't think it's an in either of our best interest. But, um,
> you know, I tossed it out there. If there is some way that you guys
> can ensure that that, uh, you know, happens legally and ethically,
> and then there is a surety on our part that's followed by this
> consultancy.

---

[9] While Company 1 was privately held, its parent company, Company 2, was publicly traded on a
U.S. exchange.  Litzenburg repeatedly referred to Company 2 during calls and meetings with
Company 1's counsel, indicating he was aware of the relationship.

At another point, Litzenburg was asked who would be deposed. Litzenburg responded, "I was suggesting your toxicologist. Um, I think that would be better than trying to set up something where, like, our tox[icologist] takes a dive."

34.   During the meeting, attorneys representing Company 1 asked what entity would serve as the entity to which the $200 million would be paid. In Litzenburg's presence, Associate 2 stated the money would be paid to "Golden Ratio LLC," and confirmed that Associate 2 and Litzenburg were the beneficial owners of Golden Ratio, which is a Virginia entity.

 a. According to public records from the Commonwealth of Virginia State Corporation Commission, "Golden Ratio, LLC" is an active Virginia corporation registered on or about October 21, 2019 (after Litzenburg first made the "demand" that Company 1 enter a consultancy with him).

 b. Associate 2 is listed as the registered agent of Golden Ratio, LLC.

35.   During the in-person meeting, Litzenburg was asked what would prevent his current client, Person 1, from telling other people about her settlement with Company 1, were it to happen. Litzenburg clarified that Person 1 had not seen the draft complaint sent to Company 1 in her name, and he did not believe he had ever mentioned the name of Company 1 to Person 1.

## VII. Litzenburg Outlines Details of His Demand for $200 Million in "Consulting Agreements" with Company 1 and Company 2

36.   On or about November 14, 2019, Litzenburg sent Attorney 1 and Attorney 2 an email with the subject "Consult," in which he discussed details regarding "a potential consulting relationship with [Company 2] if and when I have no conflicts."

 a. Litzenburg began by describing two "consulting arrangements": one for himself and Associate 2, and separate agreement for Associate 1. Associate 1's "consulting" arrangement, Litzenburg explained, would be with Company 1.

Litzenburg, in turn, proposed that he and Associate 2 would "consult for an entity other than that which owns [Company 1]," and then suggested a subsidiary of Company 2 that he said did not directly own Company 1.

    b.  Litzenburg wrote, "The price has been discussed. The relationship would begin on execution of agreement . . . with full payment contemplated on Jan 2, 2020." Litzenburg then directed that the payment should be made "to our business Golden Ratio LLC."

    c.  Litzenburg also stated that he would not work any substantial work for Company 2. "While I would engage fully and seriously with [Company 2], etc., when needed, I would expect the total active consulting to not to amount to more than a few weeks per year."

37.    On or about November 14, 2019, Litzenburg sent Attorney 1 and Attorney 2 a second email with the subject "expert." As discussed above, Litzenburg at one point proposed that he could assist Company 1 by "tak[ing] a dive" during a deposition of a toxicology expert, in order to undermine the merits of any subsequent litigation against Company 1. In furtherance of his proposed "dive," Litzenburg's second email included written questions that he would "expect [to be] the substance of a probably two-hour bellwether tox[icology] expert depo[sition] to be, such as we discussed." Litzenburg then included approximately thirty-seven topics and questions dealing with toxicological subjects connected to the carcinogenic effects of chemicals produced by Company 1 and related topics.

38.    On or about November 15, 2019, Litzenburg and Attorney 2 spoke by telephone. Prior to the call, Attorney 2 consented to having USPIS record the telephone conversation.

    a.  On the call, Litzenburg developed more particular demands for the "consulting

15

arrangement." Specifically, Litzenburg stated that Associate 1 (the Chicago-based attorney Litzenburg claimed to work with) would "consult" for Company 1, while Litzenburg in turn would "consult" for Company 2 (the publicly traded company that owned Company 1). Litzenburg stated that he had spoken with Associate 1, and that "we've decided all he [Associate 1] wants to know is that he is consulting for [Company 1]." Litzenburg then stated, of the $200 million "consulting fees" he had demanded, $50 million would go to an entity controlled by Associate 1, and the remaining $150 million would go to Golden Ratio, LLC.

    b.  Litzenburg also indicated that, through this arrangement, he would divert cases involving Company 2 or its subsidiaries to Associate 1. Litzenburg stated, "[I]f I have a problem in the future that I need to get it taken care of, and I refer to [Associate 1] a single products [liability] case, he will understand that that is sort of a wink to go to the manufacturer of the product and do a private one off settlement."

## VIII. Litzenburg Emails a Draft "Consulting Agreement" for Associate 1 and a List of Purported Clients He Would Not Tell About Company 1 in Exchange for a "Consulting Agreement"

39.    On or about November 24, 2019, Litzenburg emailed Attorney 1 and Attorney 2 with the subject "Deliverables." Litzenburg attached two PDF documents to the email.

40.    Litzenburg identified the first attachment as a "client list" of clients that he was representing in the Monsanto-Roundup litigation. The document contained approximately 1,001 entries, each purporting to have the initials of the litigant, the date they were engaged by Litzenburg, the plaintiff's purported state of residence, and the plaintiff's purported zip code.

41.    Litzenburg identified the second attachment as the "[s]ubstance of [Associate 1]'s

agreement." The attachment was a one-page "confidential agreement" between Associate 1 and Company 1, in which "[t]he parties agree that [Company 1], as of the date of execution, will retain [Associate 1] as an 'Ad Hoc' consultant."

    a. The document also provided, "This agreement is of strict confidentiality; its existence, nature, content or details shall not be disclosed to third parties (with exception of Timothy Litzenburg) absent express written agreement of the parties or a valid court order."

    b. As to length of service, the document said that "[t]he duration of this consulting relationship shall be 99 years beginning on the date of execution."

    c. Finally, the document provided: "The consideration for said consultancy shall be a one-time payment from [Company 1] to [Associate 1] of FIFTY MILLION DOLLARS ($50,000,000), on January 2, 2020." (Capitalization in Original).

## Conclusion

42.    Based on my training and experience, and the information provided in this affidavit, I respectfully submit that there is probable cause to believe that beginning on a date unknown, but from at least in or around September 2019 to November 2019, within the Western District of Virginia, Timothy Litzenburg committed transmission of interstate communications with intent to extort (in violation of 18 U.S.C. § 875(d)), conspiracy to commit transmission of interstate communications with intent to extort (in violation of 18 U.S.C. § 371), and attempted extortion, as well as conspiracy to commit extortion (in violation of 18 U.S.C. § 1951).

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

Inspector Kevin Towers
United States Postal Inspection Service

Sworn to and subscribed before me this 16th day of December, 2019.

The Honorable Joel C. Hoppe
United States Magistrate Judge

18

CLERK'S OFFICE U.S DIST. COURT
AT HARRISONBURG, VA
FILED
6/19/20
JULIA C. DUDLEY, CLERK
BY:    K. Dotson
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
# CHARLOTTESVILLE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | Case No.   3:20cr00013 |
| **v.** | : | |
| | : | Violations:   18 U.S.C. § 875(d) |
| **TIMOTHY LITZENBURG,** | : | 18 U.S.C. § 2 |
| | : | |
| **Defendant.** | : | |

## CRIMINAL INFORMATION

The United States Attorney charges that:

### Relevant Entities and Individuals

1.    TIMOTHY LITZENBURG was an active member of the Virginia bar whose office was located in Charlottesville, Virginia.

2.    Daniel Kincheloe was an active member of the Virginia bar whose office was located in Richmond, Virginia.

3.    Company 1 was a chemicals manufacturer, with facilities located all over the world.

4.    Company 2 was a publicly traded U.S. corporation listed on the NASDAQ exchange. In or around 2018, Company 2 acquired Company 1.

5.    Attorney 1 was a lawyer employed at a large U.S. law firm.    Attorney 1 represented Company 1 in discussions with LITZENBURG and Kincheloe.

6.    Golden Ratio, LLC was an active Virginia corporation registered on or about October 21, 2019.    Kincheloe was listed as the registered agent of Golden Ratio, LLC.

**Exhibit "C"**

**COUNT 1**
**Transmission of Interstate Communications with Intent to Extort**
**(18 U.S.C. § 875(d))**

1.    Paragraphs 1 through 6 of this Criminal Information are realleged and incorporated by reference as though fully set forth herein.

2.    On or about October 24, 2019, in the Western District of Virginia and elsewhere, TIMOTHY LITZENBURG, aided and abetted by the defendant, Daniel Kincheloe, did knowingly, and with intent to extort from a corporation any money and other thing of value, did transmit in interstate commerce a communication containing a threat to injure the property and reputation of a corporation, to wit, LITZENBURG, aided and abetted by Kincheloe, in an interstate email sent to Attorney 1, threatened to cause substantial financial harm to Company 1 and its reputation if Company 1 did not agree to enter a purported "consulting agreement" with LITZENBURG and Kincheloe, and make payments to LITZENBURG, Kincheloe, and others of $200,000,000 to their company, Golden Ratio, LLC.

In violation of Title 18, United States Code, Sections 875(d) and 2.


ROBERT A. ZINK
Chief, Fraud Section
Criminal Division
United States Department of Justice

By: _____

L. Rush Atkinson
Assistant Chief
Henry P. Van Dyck
Principal Assistant Chief

2

CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

6/19/20

JULIA C. DUDLEY, CLERK
BY:     K. Dotson

DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                          Criminal No.   3:20cr00013

TIMOTHY LITZENBURG

## PLEA AGREEMENT

I have agreed to enter into a plea agreement with the United States of America, pursuant to Rule 11 of the Federal Rules of Criminal Procedure. The terms and conditions of this agreement are as follows:

## A. **CHARGE(S) TO WHICH I AM PLEADING GUILTY AND WAIVER OF RIGHTS**

### 1. **The Charges and Potential Punishment**

My attorney has informed me of the nature of the charge and the elements of the charge that must be proved by the United States beyond a reasonable doubt before I could be found guilty as charged.

I agree to plead guilty to an Information, which is a charge brought by the United States Department of Justice, Criminal Division, Fraud Section as opposed to one returned by a Grand Jury. I am waiving and giving up my right to be charged by Indictment and have a Grand Jury vote on my probable guilt.

I will enter a plea of guilty to Count 1 of the Information.

Count 1 charges me with transmission of interstate communications with intent to extort, in violation of 18 U.S.C. § 875(d). The maximum statutory penalty is a term of imprisonment of two years and/or a fine of $250,000, plus a term of supervised release of one year.

I understand restitution may be ordered, my assets may be subject to forfeiture, and fees may be imposed to pay for incarceration, supervised release, and costs of prosecution. In addition,

*Defendant's Initials:*   TL

Page 1 of 12

Exhibit "D"

a $100 special assessment, pursuant to 18 U.S.C. § 3013, will be imposed per felony count of conviction. I further understand my supervised release may be revoked if I violate its terms and conditions. I understand a violation of supervised release increases the possible period of incarceration.

I am pleading guilty as described above because I am in fact guilty and because I believe it is in my best interest to do so and not because of any threats or promises. There has been no promise made whatsoever by anyone as to what the final disposition of this matter will be.

### 2. Waiver of Constitutional Rights Upon a Plea of Guilty

I acknowledge I have had all of my rights explained to me and I expressly recognize I have the following constitutional rights and, by voluntarily pleading guilty, I knowingly waive and give up these valuable constitutional rights:

    a. The right to plead not guilty and persist in that plea;
    b. The right to a speedy and public jury trial;
    c. The right to assistance of counsel at that trial and in any subsequent appeal;
    d. The right to remain silent at trial;
    e. The right to testify at trial;
    f. The right to confront and cross-examine witnesses called by the government;
    g. The right to present evidence and witnesses in my own behalf;
    h. The right to compulsory process of the court;
    i. The right to compel the attendance of witnesses at trial;
    j. The right to be presumed innocent;
    k. The right to a unanimous guilty verdict; and
    l. The right to appeal a guilty verdict.

## B. SENTENCING PROVISIONS

### 1. General Matters

I understand the determination of what sentence should be imposed, within the confines of any applicable statutory minimums and maximums, is in the sole discretion of the Court subject to its consideration of the United States Sentencing Guidelines ("guidelines" or "U.S.S.G") and the factors set forth at 18 U.S.C. § 3553(a). I understand I will have an opportunity to review a copy of my presentence report in advance of my sentencing hearing and may file objections, as appropriate. I will have an opportunity at my sentencing hearing to present evidence, bring witnesses, cross-examine any witnesses the government calls to testify, and argue to the Court

*Defendant's Initials:* ___

what an appropriate sentence should be within the confines of the terms of this agreement.

I understand I will not be eligible for parole during any term of imprisonment imposed. I understand the Court is not bound by any recommendation or stipulation contained in this agreement and may sentence me up to the statutory maximum. I understand I will not be allowed to withdraw my plea of guilty if the Court disregards the stipulations and/or recommendations set forth in the plea agreement.

I understand if the sentence is more severe than I expected, I will have no right to withdraw my plea. I have discussed sentencing issues with my attorney and realize there is a substantial likelihood I will be incarcerated.

## 2. **Sentencing Guidelines**

I stipulate and agree that all matters pertaining to any of the counts of the charging document(s), including any dismissed counts, are relevant conduct for purposes of sentencing.

The parties agree the 2018 edition of the United States Sentencing Guidelines Manual applies to any guidelines calculation made pertaining to my offense(s). I stipulate that the following guideline section(s) are applicable to my conduct:

| 2B3.3(a) | 9 | Base Offense Level |
| 2B3.3(b)(1) & 2B1.1(b)(1)(N) | + 26 | Amount demanded between $150 million and $250 million |

I agree to accept responsibility for my conduct. If I comply with my obligations under this plea agreement and accept responsibility for my conduct, the United States will recommend the Court grant me a two-level reduction in my offense level, pursuant to U.S.S.G. § 3E1.1(a) and, if applicable, at sentencing, will move that I receive a one-level reduction in my offense level, pursuant to U.S.S.G. § 3E1.1(b), for purposes of any guidelines calculation. However, I stipulate that if I fail to accept responsibility for my conduct or fail to comply with any provision of this plea agreement, I should not receive credit for acceptance of responsibility.

## 3. **Substantial Assistance**

I understand the United States retains all of its rights pursuant to Fed. R. Crim. P. 35(b), U.S.S.G. §5K1.1 and 18 U.S.C. § 3553(e). I understand even if I fully cooperate with law enforcement, the United States is under no obligation to make a motion for the reduction of my sentence. I understand if the United States makes a motion for a reduction in my sentence, the

*Defendant's Initials:* ___TC___

Court, after hearing the evidence, will determine how much of a departure, if any, I should be given.

### 4. **Monetary Obligations**

#### a. **Special Assessments, Fines and Restitution**

I understand persons convicted of crimes are required to pay a mandatory assessment of $100.00 per felony count of conviction. I agree I will submit to the U.S. Clerk's Office, a certified check, money order, or attorney's trust check, made payable to the "Clerk, U.S. District Court" for the total amount due for mandatory assessments prior to entering my plea of guilty.

I agree to pay restitution for the entire scope of my criminal conduct, including, but not limited to, all matters included as relevant conduct. In addition, I agree to pay any restitution required by law, including, but not limited to, amounts due pursuant to 18 USC §§ 2259, 3663, and/or 3663A. I understand and agree a requirement I pay restitution for all of the above-stated matters will be imposed upon me as part of any final judgment in this matter.

I further agree to make good faith efforts toward payment of all mandatory assessments, restitution and fines, with whatever means I have at my disposal. I agree failure to do so will constitute a violation of this agreement. I will execute any documents necessary to release the funds I have in any repository, bank, investment, other financial institution, or any other location in order to make partial or total payment toward the mandatory assessments, restitution and fines imposed in my case.

I fully understand restitution and forfeiture are separate financial obligations which may be imposed upon a criminal defendant. I further understand there is a process within the Department of Justice whereby, in certain circumstances, forfeited funds may be applied to restitution obligations. I understand no one has made any promises to me that such a process will result in a decrease in my restitution obligations in this case.

I understand and agree, pursuant to 18 U.S.C. §§ 3613 and 3664(m), whatever monetary penalties are imposed by the Court will be due immediately and subject to immediate enforcement by the United States as provided for by statute. I understand if the Court imposes a schedule of payments, that schedule is only a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment.

I agree to grant the United States a wage assignment, liquidate assets, or complete any other tasks which will result in immediate payment in full, or payment in the shortest time in which full

*Defendant's Initials:* _____

payment can be reasonably made as required under 18 U.S.C. § 3572(d).

I expressly authorize the United States Department of Justice to obtain a credit report on me in order to evaluate my ability to satisfy any financial obligation imposed by the Court.

I agree the following provisions, or words of similar effect, should be included as conditions of probation and/or supervised release: (1) "The defendant shall notify the Financial Litigation Unit, United States Attorney's Office, in writing, of any interest in property obtained, directly or indirectly, including any interest obtained under any other name, or entity, including a trust, partnership or corporation after the execution of this agreement until all fines, restitution, money judgments and monetary assessments are paid in full" and (2) "The Defendant shall notify the Financial Litigation Unit, United States Attorney's Office, in writing, at least 30 days prior to transferring any interest in property owned directly or indirectly by Defendant, including any interest held or owned under any other name or entity, including trusts, partnership and/or corporations until all fines, restitution, money judgments and monetary assessments are paid in full." See 18 U.S.C. § 3664(k), (n).

Regardless of whether or not the Court specifically directs participation or imposes a schedule of payments, I agree to fully participate in inmate employment under any available or recommended programs operated by the Bureau of Prisons.

I agree any payments made by me shall be applied fully to the non-joint and several portion of my outstanding restitution balance until the non-joint and several portion of restitution is paid in full, unless the Court determines that to do so would cause a hardship to a victim of the offense(s).

**b.  Duty to Make Financial Disclosures**

I understand in this case there is a possibility substantial fines and/or restitution may be imposed.  In order to assist the United States as to any recommendation and in any necessary collection of those sums, I agree, if requested by the United States, to provide a complete and truthful financial statement to the United States Department of Justice, Criminal Division, Fraud Section, within 30 days of the request or 3 days prior to sentencing, whichever is earlier, detailing all income, expenditures, assets, liabilities, gifts and conveyances by myself, my spouse and my dependent children and any corporation, partnership or other entity in which I hold or have held an interest, for the period starting on January 1st of the year prior to the year my offense began and continuing through the date of the statement.  This financial statement shall be submitted in a form acceptable to the United States Department of Justice, Criminal Division, Fraud Section.

*Defendant's Initials:* ____

From the time of the signing of this agreement or the date I sign the financial statement, whichever is earlier, I agree not to convey anything of value to any person without the authorization of the United States Department of Justice, Criminal Division, Fraud Section.

### c.  **Understanding of Collection Matters**

I understand:

1. as part of the judgment in this case I will be ordered to pay one or more monetary obligations;
2. payment should be made as ordered by the Court;
3. I must mail payments, by cashier's check or money order, payable to the "Clerk, U.S. District Court" to:  210 Franklin Road, S.W., Suite 540, Roanoke, Virginia 24011; and include my name and court number on the check or money order;
4. interest (unless waived by the Court) and penalties must be imposed for late or missed payments;
5. the United States may file liens on my real and personal property that will remain in place until monetary obligations are paid in full, or until liens expire (the later of 20 years from date of sentencing or release from incarceration);
6. if I retain counsel to represent me regarding the United States' efforts to collect any of my monetary obligations, I will immediately notify the United States Attorney's Office, ATTN:  Financial Litigation Unit, P.O. Box 1709, Roanoke, Virginia 24008-1709, in writing, of the fact of my legal representation; and
7. I, or my attorney if an attorney will represent me regarding collection of monetary obligations, can contact the U.S. Attorney's Office's Financial Litigation Unit at (540) 857-2259.

## C.  **ADDITIONAL MATTERS**

### 1.  **Waiver of Right to Appeal**

Knowing that I have a right of direct appeal of my sentence under 18 U.S.C. § 3742(a) and the grounds listed therein, I expressly waive the right to appeal my sentence on those grounds or on any ground.  In addition, I hereby waive my right of appeal as to any and all other issues in this matter and agree I will not file a notice of appeal.  I am knowingly and voluntarily waiving any right to appeal.  By signing this agreement, I am explicitly and irrevocably directing my attorney not to file a notice of appeal.  *Notwithstanding any other language to the contrary, I am not waiving my right to appeal or to have my attorney file a notice of appeal, as to any issue which cannot be waived, by law.*  I understand the United States expressly reserves all of its rights to

*Defendant's Initials:*  _____

appeal. **I agree and understand if I file any court document (except for an appeal based on an issue that cannot be waived, by law, or a collateral attack based on ineffective assistance of counsel) seeking to disturb, in any way, any order imposed in my case such action shall constitute a failure to comply with a provision of this agreement.**

### 2. Waiver of Right to Collaterally Attack

I waive any right I may have to collaterally attack, in any future proceeding, any order issued in this matter, unless such attack is based on ineffective assistance of counsel, and agree I will not file any document which seeks to disturb any such order, unless such filing is based on ineffective assistance of counsel. **I agree and understand that if I file any court document (except for an appeal based on an issue not otherwise waived in this agreement; an appeal based on an issue that cannot be waived, by law; or a collateral attack based on ineffective assistance of counsel) seeking to disturb, in any way, any order imposed in my case, such action shall constitute a failure to comply with a provision of this agreement.**

### 3. Information Access Waiver

I knowingly and voluntarily agree to waive all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. §552, or the Privacy Act of 1974, 5 U.S.C. §552a.

### 4. Waiver of Witness Fee

I agree to waive all rights, claims or interest in any witness fee I may be eligible to receive pursuant to 28 U.S.C. § 1821, for my appearance at any Grand Jury, witness conference or court proceeding.

### 5. Abandonment of Seized Items

By signing this plea agreement, I hereby abandon my interest in, and consent to the official use, destruction or other disposition of each item obtained by any law enforcement agency during the course of the investigation, unless such item is specifically provided for in another provision of this plea agreement. I further waive any and all notice of any proceeding to implement the official use, destruction, abandonment, or other disposition of such items.

### 6. Deportation

*Defendant's Initials:* _____

I understand if I am not a citizen of the United States, I may be subject to deportation from the United States, denied United States citizenship, and denied admission to the United States in the future, as a result of my conviction for the offense(s) to which I am pleading guilty.

### 7. **Denial of Federal Benefits**

At the discretion of the court, I understand I may also be denied any or all federal benefits, as that term is defined in 21 U.S.C. § 862, (a) for up to five years if this is my first conviction of a federal or state offense consisting of the distribution of controlled substances, or up to one year if this is my first conviction of a federal or state offense involving the possession of a controlled substance; or (b) for up to ten years if this is my second conviction of a federal or state offense consisting of the distribution of controlled substances, or up to five years if this is my second or more conviction of a federal or state offense involving the possession of a controlled substance. If this is my third or more conviction of a federal or state offense consisting of the distribution of controlled substances, I understand I could be permanently ineligible for all federal benefits, as that term is defined in 21 U.S.C. § 862(d).

### 8. **Admissibility of Statements**

I understand if I fail to plead guilty in accordance with this agreement or withdraw my plea(s) of guilty any statements I make (including this plea agreement, and my admission of guilt) during or in preparation for any guilty plea hearing, sentencing hearing, or other hearing and any statements I make or have made to law enforcement agents, in any setting (including during a proffer), may be used against me in this or any other proceeding. I knowingly waive any right I may have under the Constitution, any statute, rule or other source of law to have such statements, or evidence derived from such statements, suppressed or excluded from being admitted into evidence and stipulate that such statements can be admitted into evidence.

### 9. **Additional Obligations**

Should the parties agree to meet, I agree to cooperate fully with law enforcement agents and will disclose to them, at any time requested by them, my knowledge of any criminal activity. If I testify at a later date, I agree I will testify truthfully. Should the parties agree to meet, I hereby waive any right I may have to refuse to answer any questions and agree to be debriefed by law enforcement agents concerning any matter. I understand it is a felony offense to make false statements to law enforcement agents or to testify falsely.

I agree not to commit any of the following acts:

- attempt to withdraw my guilty plea;

*Defendant's Initials:* _____

Page 8 of 12

- deny I committed any crime to which I have pled guilty;
- make or adopt any arguments or objections to the presentence report that are inconsistent with this plea agreement;
- obstruct justice;
- fail to comply with any provision of this plea agreement;
- commit any other crime;
- make a false statement;
- fail to enter my plea of guilty when scheduled to do so, unless a continuance is agreed to by the United States Attorney's Office and granted by the Court;
- fail to testify truthfully, as to any matter, if called upon to do so (at my sentencing hearing or any other proceeding);
- refuse to answer any question;
- fail to comply with any reasonable request of the United States Attorney's Office; or
- fail to cooperate with law enforcement agents.

## D. <u>REMEDIES AVAILABLE TO THE UNITED STATES</u>

I hereby stipulate and agree that the United States Department of Justice, Criminal Division, Fraud Section may, at its election, pursue any or all of the following remedies if I fail to comply with any provision of this agreement: (a) declare this plea agreement void; (b) refuse to dismiss any charges; (c) reinstate any dismissed charges; (d) file new charges; (e) withdraw any substantial assistance motion made, regardless of whether substantial assistance has been performed; (f) refuse to abide by any provision, stipulations, and/or recommendations contained in this plea agreement; or (g) take any other action provided for under this agreement or by statute, regulation or court rule.

In addition, I agree if, for any reason, my conviction is set aside, or I fail to comply with any obligation under the plea agreement, the United States may file, by indictment or information, any charges against me which were filed and/or could have been filed concerning the matters involved in the instant investigation. I hereby waive my right under Federal Rule of Criminal Procedure 7 to be proceeded against by indictment and consent to the filing of an information against me concerning any such charges. I also hereby waive any statute of limitations defense as to any such charges.

The remedies set forth above are cumulative and not mutually exclusive. The United States' election of any of these remedies, other than declaring this plea agreement void, does not, in any way, terminate my obligation to comply with the terms of the plea agreement. The use of "if" in this section does not mean "if, and only if."

*Defendant's Initials:* TL

Page 9 of 12

## E. **GENERAL PROVISIONS**

### 1. **Limitation of Agreement**

This agreement only binds the United States Department of Justice, Criminal Division, Fraud Section. It does not bind any state or local prosecutor, other United States Attorney's Office or other office or agency of the United States Government, including, but not limited to, the Tax Division of the United States Department of Justice, or the Internal Revenue Service of the United States Department of the Treasury. These individuals and agencies remain free to prosecute me for any offense(s) committed within their respective jurisdictions.

### 2. **Effect of My Signature**

I understand my signature on this agreement constitutes a binding offer by me to enter into this agreement. I understand the United States has not accepted my offer until it signs the agreement.

### 3. **Effective Representation**

I have discussed the terms of the foregoing plea agreement and all matters pertaining to the charges against me with my attorney and am fully satisfied with my attorney and my attorney's advice. At this time, I have no dissatisfaction or complaint with my attorney's representation. I agree to make known to the Court no later than at the time of sentencing any dissatisfaction or complaint I may have with my attorney's representation.

### 4. **Misconduct**

If I have any information concerning any conduct of any government attorney, agent, employee, or contractor which could be construed as misconduct or an ethical, civil, or criminal violation, I agree to make such conduct known to the United States Department of Justice, Criminal Division, Fraud Section and the Court, in writing, as soon as possible, but no later than my sentencing hearing.

### 5. **Final Matters**

I understand a thorough presentence investigation will be conducted and sentencing recommendations independent of the United States Department of Justice, Criminal Division, Fraud Section will be made by the presentence preparer, which the Court may adopt or take into

*Defendant's Initials:* ͞T ͞L

consideration. I understand any calculation regarding the guidelines by the United States Department of Justice, Criminal Division, Fraud Section or by my attorney is speculative and is not binding upon the Court, the Probation Office or the United States Department of Justice, Criminal Division, Fraud Section. No guarantee has been made by anyone regarding the effect of the guidelines on my case.

I understand the prosecution will be free to allocute or describe the nature of this offense and the evidence in this case and make any recommendations not prohibited by this agreement.

I understand the United States retains the right, notwithstanding any provision in this plea agreement, to inform the Probation Office and the Court of all relevant facts, to address the Court with respect to the nature and seriousness of the offense(s), to respond to any questions raised by the Court, to correct any inaccuracies or inadequacies in the presentence report and to respond to any statements made to the Court by or on behalf of the defendant.

I willingly stipulate there is a sufficient factual basis to support each and every material factual allegation contained within the charging document(s) to which I am pleading guilty.

I understand this agreement does not apply to any crimes or charges not addressed in this agreement. I understand if I should testify falsely in this or in a related proceeding I may be prosecuted for perjury and statements I may have given authorities pursuant to this agreement may be used against me in such a proceeding.

I understand my attorney will be free to argue any mitigating factors on my behalf; to the extent they are not inconsistent with the terms of this agreement. I understand I will have an opportunity to personally address the Court prior to sentence being imposed.

This writing sets forth the entire understanding between the parties and constitutes the complete plea agreement between the United States Department of Justice, Criminal Division, Fraud Section, and me, and no other additional terms or agreements shall be entered except and unless those other terms or agreements are in writing and signed by the parties. This plea agreement supersedes all prior understandings, promises, agreements, or conditions, if any, between the United States and me.

I have consulted with my attorney and fully understand all my rights. I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand this agreement and I voluntarily agree to it. I have not been coerced, threatened, or promised anything other than the terms of this plea agreement, described above, in exchange for my plea of guilty. Being aware of all of the possible consequences of my plea, I have independently decided to enter this plea of

*Defendant's Initials:* _____

my own free will, and am affirming that agreement on this date and by my signature below.

Date: 5/10/20

Timothy Litzenburg, Defendant

    I have fully explained all rights available to my client with respect to the offenses listed in the pending charging document(s). I have carefully reviewed every part of this plea agreement with my client. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

    If I will continue to represent my client regarding the United States' efforts to collect any monetary obligations, I will notify the United States Attorney's Office, ATTN: Financial Litigation Unit, P.O. Box 1709, Roanoke, Virginia 24008-1709, in writing, of the fact of my continued legal representation within 10 days of the entry of judgment in this case.

Date: May 20, 2020

Jacqueline Reiner, Esq.
**Counsel for Defendant**

Attorneys for the United States:

Date: June 1, 2020

L. Rush Atkinson
**Assistant Chief, Fraud Section**
**U.S. Department of Justice, Criminal Division**
**New York State Bar Registration No. 4977377**

Date: June 17, 2020

Henry P. Van Dyck
**Principal Assistant Chief, Fraud Section**
**U.S. Department of Justice, Criminal Division**
**District of Columbia Bar No. 979872**

*Defendant's Initials:* TL

Page 12 of 12

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.:  3:20cr00013 |
| | ) | |
| TIMOTHY LITZENBURG | ) | |
| | ) | |

## STATEMENT OF FACTS

The parties stipulate that the allegations contained in the Information and the following facts are true and correct, and that had this matter gone to trial, the United States would have proven each of these facts beyond a reasonable doubt.

TIMOTHY LITZENBURG was an active member of the Virginia bar whose office was located in Charlottesville, Virginia.  Daniel Kincheloe was an active member of the Virginia bar whose office was located in Richmond, Virginia.  Starting in or around 2018, LITZENBURG and Kincheloe formed a law firm specializing in representing plaintiffs in mass torts litigation.

As partners, LITZENBURG and Kincheloe represented plaintiffs who alleged that the weed-killer sold under the brand name Roundup caused cancer in Roundup users.  By the fall of 2019, LITZENBURG and Kincheloe had been engaged by hundreds of clients to represent them as plaintiffs in litigation related to Roundup.

Company 1 was a chemicals manufacturer, with facilities located all over the world. Company 2 was a publicly traded U.S. corporation listed on the NASDAQ exchange.  In or around 2018, Company 2 acquired Company 1.

In or around early September 2019, LITZENBURG, with Kincheloe's agreement and knowledge, transmitted to Company 1 a draft complaint ("Draft Complaint") on behalf of Person 1, whom LITZENBURG and Kincheloe represented.  The Draft Complaint alleged that Company 1 and other related companies were responsible for several chemical compounds used in Roundup, and that certain of those chemicals caused cancer in Roundup users.  Among other things, the Draft Complaint alleged that Company 1 knew of the carcinogenic properties of these chemicals but failed to warn Roundup users and others exposed to Roundup about such risks.

After receiving the Draft Complaint, Attorney 1 and Attorney 2 began representing Company 1 as Company 1's counsel in discussions with LITZENBURG and Kincheloe.

*Defendant's Initials:* ___TL___

Page 1 of 5

**Exhibit "E"**

On or about October 16, 2019, LITZENBURG, Kincheloe, and Attorney 1 participated in a telephone call while Attorney 1 was outside the Commonwealth of Virginia. In sum and substance, LITZENBURG stated during the call that he still intended to file the Draft Complaint, unless a resolution could be found. LITZENBURG also indicated that if he did file a public lawsuit, other lawsuits would likely follow as the public became aware of Company 1's role. After describing the possibility of the lawsuits against Company 1, LITZENBURG proposed, in sum and substance, that he and Kincheloe could enter into a "consulting arrangement" with Company 1. Doing so, LITZENBURG stated, would create a purported conflict-of-interest that would effectively stop him from representing plaintiffs in future litigation against Company 1. After the October 16, 2019 call, LITZENBURG, with Kincheloe's knowledge and agreement, demanded that Company 1 pay LITZENBURG, Kincheloe, and others, a total of $200 million in purported "consulting fees."

On or about October 21, 2019, Kincheloe registered Golden Ratio, LLC as a Virginia corporation. LITZENBURG and Kincheloe agreed together to create Golden Ratio, LLC for the purpose of receiving monies from Company 1, which LITZENBURG and Kincheloe agreed to split amongst themselves and their associates. LITZENBURG and Kincheloe agreed that they would not distribute any of the monies Company 1 paid them as purported "consulting fees" to their existing clients. LITZENBURG and Kincheloe further agreed that they would each take $50 million of the $200 million in total payments from Company 1 for themselves, with the remainder paid to two other associates.

On or about October 24, 2019, LITZENBURG sent an email to Attorney 1 while Attorney 1 was outside the Commonwealth of Virginia. In the email, which Kincheloe helped draft, LITZENBURG made threats to injure the property and reputation of Company 1 and Company 2 unless LITZENBURG, Kincheloe, and others were paid $200 million pursuant to purported "consulting arrangements." If the $200 million was not paid, LITZENBURG threatened in the email that LITZENBURG, Kincheloe, and others would commence litigation that would become "an ongoing and exponentially growing problem for [Company 1], particularly when the media inevitably takes notice." LITZENBURG further threatened in the email that such litigation would cost Company 1 and Company 2 "billions, setting aside the associated drop in stock price and reputation damage."

On or about October 30, 2019, LITZENBURG, Attorney 1 and Attorney 2 participated in a telephone call while Attorney 1 was outside the Commonwealth of Virginia. During the call, Attorney 1 asked how LITZENBURG arrived at the $200 million figure he had asked for in purported "consulting fees." LITZENBURG responded, "It's opportunity loss," later adding, "I think it's lower than the extraordinarily low-end estimate of what [LITZENBURG and Kincheloe] would make off this litigation." Later in the call, Attorney 2 asked LITZENBURG whether the funds would be "going into a[n] . . . individual plaintiff's compensation fund or anything like that,"

*Defendant's Initials:* _____

or whether the money would instead be "going straight to you and your partners[?]"   In response, LITZENBURG, in sum and substance, confirmed that the $200 million payment would not be shared with clients purportedly hurt by chemicals used in Roundup, and that the money would instead go directly to LITZENBURG, Kincheloe, and other attorneys representing individuals involved in Roundup litigation.   Also during the call, LITZENBURG, in sum and substance, indicated that in exchange for the $200 million payment he would not discuss Company 1 or Company 2 with his current clients.   Finally, in sum and substance, LITZENBURG proposed that in exchange for the $200 million payment he would be willing to "take a dive" during a deposition of a toxicology expert identified by Company 1, so that Company 1 could then use the deposition to defend against any potential future claims related to litigation against Company 1.

On or about November 6, 2019, LITZENBURG sent an email to Attorney 1 and Attorney 2, copying Kincheloe, while both Attorney 1 and Attorney 2 were outside the Commonwealth of Virginia.   In the email, LITZENBURG made threats to injure the property and reputation of Company 1 and Company 2 unless LITZENBURG, Kincheloe, and others were paid the $200 million pursuant to purported "consulting arrangements."   LITZENBURG claimed in the email that he had a "list of 1000ish Roundup clients" and threatened that unless LITZENBURG, Kincheloe, and others were paid the $200 million, Company 1 would have "thousands of future plaintiffs against [Company 1]."   LITZENBURG concluded the email in part by threatening, "That is another thing I can guarantee and warrant: in the absence of a so-called 'global' or final deal with me, this will certainly balloon into an existential threat to [Company 1]."

On or about November 12, 2019, LITZENBURG and Kincheloe met in person with Attorney 1 and Attorney 2 at a conference center in Charlottesville, Virginia.   During the meeting, LITZENBURG again threatened to injure the property and reputation of Company 1 and Company 2 unless LITZENBURG, Kincheloe, and others were paid $200 million pursuant to purported "consulting arrangements."   LITZENBURG said in part: "what's certain . . . is that if we walk out of here today without a deal, and we, uh, you know, the [Person 1] case gets filed and gets served.   And we've talked about the consequences."   LITZENBURG also stated that if LITZENBURG, Kincheloe, and others commenced litigation against Company 1, there was no way Company 1 "gets out of it for less" than "[a] billion.   Yeah.   No, I mean, nuisance value, uh, defense lawyer fees, a hit in the stock when this gets filed and served, maybe the press conference, whatever."   LITZENBURG also stated, "[W]e can be, um, your biggest problem. Right now we're your only problem or potential problem."   Later on, LITZENBURG again stated, in sum and in part, if LITZENBURG, Kincheloe, and others commenced litigation it would have adverse effects on Company 2's stock price, which LITZENBURG described as "a 40% stock loss coming off the top."   LITZENBURG also stated to Attorney 1 and Attorney 2, "We walk out of here today, and you're telling them [Company 1], you know, 'You are absolutely, absolutely making a quarter of a million, 500 million, billion plus dollar investment in a public relations nightmare.'"   Later on during the meeting, Attorney 2 asked what entity would serve as the entity to which the $200 million would be paid to LITZENBURG, Kincheloe, and others.   Kincheloe

*Defendant's Initials:* ⟨handwritten initials⟩

responded that the money should be paid to "Golden Ratio LLC," the same entity that LITZENBURG and Kincheloe had previously agreed would receive any movies paid by Company 1 and Company 2, and which Kincheloe had registered as a Virginia corporation.

On or about November 14, 2019, LITZENBURG sent an email to Attorney 1 and Attorney 2 in which he provided details regarding the purported "consulting arrangement" with Company 2. In the email, LITZENBURG wrote, "The price has been discussed. The relationship would begin on execution of agreement . . . with full payment contemplated on Jan 2, 2020." LITZENBURG further directed in the email that the payment should be made "to our business Golden Ratio LLC[,]" but that he "would expect the total active consulting to not to amount to more than a few weeks per year."

In performing the above actions, LITZENBURG attempted to extort money from Company 1 and Company 2, and agreed with Kincheloe to extort money from Company 1 and Company 2. Further, in demanding $200 million from Company 1 and Company 2, LITZENBURG did not believe that either he or Kincheloe had a valid claim of right to a $200 million payment from either Company 1 or Company 2.

The actions taken by LITZENBURG, as described above, were taken willfully, knowingly, and with the specific intent to extort money from Company 1 and Company 2. LITZENBURG acknowledges that the purpose of the foregoing statement of facts is to provide an independent factual basis for his guilty plea. It does not necessarily identify all of the persons with whom LITZENBURG might have engaged in illegal activity, nor does it necessarily identify all of the facts known to LITZENBURG concerning illegal activity in which he or others may have engaged.

Respectfully submitted,

L. Rush Atkinson
Assistant Chief, Fraud Section

Henry P. Van Dyck
Principal Assistant Chief, Fraud Section

After consulting with my attorney and pursuant to the plea agreement entered into this day, I stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

*Defendant's Initials:* TL

Page 4 of 5

_____
Timothy Litzenburg, Defendant

I am Timothy Litzenburg's attorney.    I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Jacqueline Reiner, Esquire
Counsel for Defendant

*Defendant's Initials:*

Page 5 of 5

U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
6/19/20

JULIA C. DUDLEY, CLERK
BY:    K. Dotson
       DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

UNITED STATES OF AMERICA

v.                        Criminal Action No.   3:20cr000013

TIMOTHY LITZENBURG

In the presence of Jacqueline Reiner, my counsel, who has fully explained the charges contained in the information against me, and having received a copy of the information from the United States Attorney before being called upon to plead, I hereby plead guilty to said information and count(s) 1 thereof. I have been advised of the maximum punishment which may be imposed by the court for this offense. My plea of guilty is made knowingly and voluntarily and without threat of any kind or without promises other than those disclosed here in open court.

_____
Signature of Defendant

___6/19/20_____
Date

_____ 06-17-2020
Witness

**Exhibit "F"**